**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| IAN GOODING, | ) | CASE NO. 5:16-cv-2100 |
| | ) | |
| Plaintiff, | ) | JUDGE DAN AARON POLSTER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE DAVID A. RUIZ |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| *Acting Comm'r of Social Security*, | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Ian Gooding (hereinafter "Plaintiff"), challenges the final decision of Defendant

Nancy A. Berryhill, Acting Commissioner of Social Security (hereinafter "Commissioner"),

denying his application for Supplemental Security Income ("SSI") under Title XVI of the Social

Security Act, 42 U.S.C. § 1381 *et seq*. ("Act"). This court has jurisdiction pursuant to 42 U.S.C.

§ 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an

automatic referral under Local Rule 72.2(b) for a Report and Recommendation. For the reasons

set forth below, the Magistrate Judge recommends that the Commissioner's final decision be

AFFIRMED.

## I.  Procedural History

On May 22, 2015, Plaintiff filed his application for SSI, alleging a disability onset date of

December 1, 2014. (Transcript ("Tr.") 144). The application was denied initially and upon reconsideration, and Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 80-82, 85-92, 95-97). Plaintiff participated in the hearing on April 5, 2016, was represented by counsel, and testified. (Tr. 30-61). A vocational expert ("VE") also participated and testified. *Id*. On April 21, 2016, the ALJ found Plaintiff not disabled. (Tr. 25). On July 27, 2016, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision. (Tr. 1-4). On August 22, 2016, Plaintiff filed a complaint challenging the Commissioner's final decision. (R. 1). The parties have completed briefing in this case. (R. 11 & R. 13).

Plaintiff asserts the ALJ erred in the evaluation of his mental impairments. (R. 11).

## II.   Evidence

### A. Personal and Vocational Evidence

Plaintiff was born in February of 1996 and was 18-years-old on the alleged disability onset date. (Tr.144). He had a high school education and was able to communicate in English. (Tr. 23, 36). He had no past relevant work. *Id*.

### B. Relevant Medical Evidence[1]

### 1.   Treatment Records

On October 16, 2014, Plaintiff was admitted to the hospital for "bizarre behavior" after his mother contacted the authorities reporting that Plaintiff was very agitated, reclusive, unable to keep a job, and easily irritable. (Tr. 203). Plaintiff admitted to being anxious, having erratic sleep

---

[1]  The recitation of the evidence is not intended to be exhaustive. It includes only those portions of the record cited by the parties in their briefs *and* also deemed pertinent by the court to the assignments of error raised.

behaviors, and hearing voices, which he said was his conscience. *Id*. On examination, Plaintiff

was tense, somewhat guarded, looked perplexed, and had a flat affect. (Tr. 204). His thought

process included persecutory delusion but he was not suicidal/homicidal. *Id*. Plaintiff was

diagnosed with his "likely first episode of schizophrenia," and was assigned a Global

Assessment of Functioning ("GAF") score of 20.[2] *Id*. The attending physician recommended in-

patient stabilization. *Id*.

 On October 24, 2014, Plaintiff's in-patient progress notes indicate that Plaintiff had no prior

mental health treatment. (Tr. 236). Plaintiff reported hearing "multiple voices" and "seeing

ghosts" *Id*. Plaintiff's mother reported her son's symptoms started two months earlier. *Id*.

Plaintiff was depressed, anxious, and reported traumatic stress after parents' divorce. (Tr. 247).

Plaintiff reported smoking cannabis three to four times daily. *Id*. He was diagnosed with

paranoid schizophrenia and cannabis abuse. (Tr. 253). On his discharge date, November 4, 2014,

Plaintiff was no longer psychotic and was neither suicidal nor homicidal. (Tr. 208). He was

"back to his baseline level of functions" and ascribed a GAF score of 60, indicative of moderate

symptoms, but closer to the mild range. (Tr. 208).

 On November 7, 2014, Plaintiff was seen by Michael Potesta, M.D. (Tr. 256-257). Plaintiff

reported that since his hospitalization and subsequent discharge, "his symptoms have dissipated,

been essentially non-existent, he is not having any AH or VH, no obvious delusions…" (Tr.

---

2  The GAF scale reports a clinician's assessment of an individual's overall level of functioning. An
individual's GAF is rated between 0-100, with lower numbers indicative of more severe mental
impairments. A GAF score between 11-20 indicates some danger of hurting self or others, or occasionally
failing to maintain personal hygiene, or gross impairment in communications. *Diagnostic & Statistical
Manual of Mental Disorders*, 32-34 (American Psychiatric Ass'n, 4th ed. revised, 2000) (DSM-IV). Notably,
an update of the DSM in 2013 eliminated the GAF scale because of "its conceptual lack of clarity . . . and
questionable psychometrics in routine practice." *See Diagnostic and Statistical Manual of Mental
Disorders* (DSM-5) at 16 (American Psychiatric Ass'n, 5th ed., 2013).

256). Plaintiff's mother agreed that her son was symptom-free. *Id*. However, both Plaintiff and his mother believed that Plaintiff's medication was "too sedating," reporting ten to twelve hours of sleep per day and lethargy. *Id*. Plaintiff expressed a desire not to be on any medications, but agreed that he would take medication if ultimately it was going to help him lead a better life. *Id*. Plaintiff's demeanor/behavior was average and cooperative, his speech was clear, his mood constricted, his thought process was logical and concrete, his thought content unremarkable, and his insight/judgment was "limited/fair" as he did not believe he had a mental illness. (Tr. 263-264). His current level of risk was low. (Tr. 264). Plaintiff reported his medications made him feel restless, resulting in him not sleeping as well as before. (Tr. 263). Plaintiff reported suicidal thoughts for a few days without any specific plan, but reported the thoughts had gone away and that he would never act on any of these thoughts. *Id*. Plaintiff declined antidepressant medication as well as psychotherapy. *Id*.

On December 3, 2014, Plaintiff experienced a severe dystonic reaction to his psychiatric medication, Haldol, and was admitted to the hospital on a voluntary basis for five days. (Tr. 211-212, 269).

On December 23, 2014, Plaintiff requested that Dr. Potesta increase his medication because he was having constant auditory hallucinations. (Tr. 275). He denied feeling depression and refused antidepressant medication, though the physician believed Plaintiff met the criteria for major depressive episodes (MDE). *Id*.

On January 14, 2015, Plaintiff reported to Dr. Potesta that he was doing much better with his suicidal thoughts. (Tr. 282). Dr. Potesta noted that Plaintiff continued to appear depressed, though he was "much more animated, was smiling at times, and appeared more relaxed." *Id*.

Plaintiff's mother agreed. *Id*. Plaintiff did not want to try any antidepressant medications. *Id*.

On January 22, 2015, Plaintiff told Dr. Potesta that he has not been taking his medication over the past ten days, because he "did not like the way the medicine made me feel." (Tr. 288). Plaintiff reported his desire not to take any medication at all, but understood discontinuation of his antipsychotic drugs could result in worsening of his illness. *Id*. Plaintiff denied any recurrence of psychotic symptoms since discontinuing his medication, and his mother agreed that she has not observed any bizarre behaviors or psychotic symptoms. *Id*. She did express concern that Plaintiff was abusing marijuana again, because he had been spending more time with his friends as of late. *Id*.

On January 29, 2015, Plaintiff had stopped taking all medications and reported feeling better with more energy. (Tr. 294). He also reported feeling less depressed, and had not noticed a recurrence of his psychotic symptoms. *Id*. Plaintiff was open to discussing both counseling and employment. *Id*.

On February 5, 2015, Plaintiff reported doing well, having a lot more energy, had a brighter affect, and reported an increased amount of socialization with friends. (Tr. 300). He continued to hear voices, but he ignored them or distracted himself when they arose. *Id*. He continued to express his wish to avoid antipsychotic or antidepressant medications. *Id*. He reported using marijuana one to three times per week. *Id*.

On February 20, 2015, Plaintiff was transferred from Dr. Potesta to psychiatrist Humayun Chughtai, M.D. (Tr. 307). Dr. Chughtai noted that Plaintiff had "been doing ok" since Plaintiff's October 2014 hospitalization, and noted that Plaintiff was not taking any medications. *Id*. Plaintiff's mother also indicated that he was doing well without medication. *Id*. Dr. Chughtai's

5

notes stated that "At Present he is Fine There is no evidence of psychoses at present and they would like to hold the meds and he shall be monitored by us and by Mom if any concern he would be brought back here for med evaluation." *Id*. Plaintiff reported smoking marijuana once or twice per day. *Id*. Based on a review of Plaintiff's history, Dr. Chughtai noted that Plaintiff had been an average child with a normal social life, and attributed his psychotic break to multiple stressors. *Id*. Dr. Chughtai noted Plaintiff had been doing fine without medication and experienced no more psychotic symptoms. *Id*. It was his opinion that Plaintiff had a "[b]rief psy[h]cotic reaction under extream [sic] stress rather than Paranoid pschizopherenea [sic]." *Id*. Dr. Chughtai assigned Plaintiff a GAF score of 54, indicative of moderate symptoms. (Tr. 309).

On March 20, 2015, Plaintiff was seen by Dr. Chughtai and he reported doing well without medications and had no psychotic symptoms. (Tr. 321). Plaintiff's mother concurred that Plaintiff was stable and did not believe Plaintiff needed any medication. (Tr. 321). Plaintiff continued to report "still smokes weed." *Id*.

On May 27, 2015, Plaintiff was again seen by Dr. Chughtai along with Plaintiff's mother. (Tr. 321). Plaintiff denied any depressive or psychotic symptoms, and his mother indicated she had no present concerns. *Id*. Plaintiff had been "helping his brother painting his house and keeping busy." *Id*. Plaintiff continued to express his desire to avoid medications, and Dr. Chughtai agreed, noting that "I don't see any symptoms to be treated at this time." *Id*. Plaintiff continued to report smoking marijuana. *Id*. His GAF score remained at 54. (Tr. 323).

On July 22, 2015, Dr. Chughtai saw Plaintiff for a follow-up. (Tr. 337). Both Plaintiff and his mother reported that he was doing well without medications. *Id*. "Mood has been ok. sleep ok. no manic or psychotic symptoms and no other concerns at present … still smokes weed

6

regularly." *Id.*

On September 16, 2015, Plaintiff had a follow-up appointment with Dr. Chughtai, but would not enter his office and was pacing in the hallway. (Tr. 330). Plaintiff's mother reported that he had been "up and down," was not sleeping well, and had been abrasive towards her. *Id.* (R. 330). Plaintiff insisted that he did not need medication, though Dr. Chughtai believed medication would help if Plaintiff agreed to take it. *Id.*

On October 30, 2015, Dr. Chughtai noted that Plaintiff remained unreceptive to taking any medications and continued to assess a GAF score of 54. (Tr. 393).

On November 3, 2015, Plaintiff began counseling with Paul Sarsany, a professional clinical counselor ("PCC"). (Tr. 373-376). Plaintiff was unkempt, restless but cooperative, had average eye contact and activity, clear speech, no reported delusions or hallucinations, a tangential thought process, no reported impairment of memory or attention/concentration, and he had poor insight/judgment. (Tr. 373-374). Mr. Sarsany indicated that Plaintiff was not compliant with prescribed care and was refusing medications. (Tr. 374). He noted conflict in the relationship between Plaintiff and his mother due to a conviction for misdemeanor domestic violence. *Id.* Plaintiff appeared lost, especially without his mother's support. *Id.* Plaintiff reported hearing weird voices mostly while watching television, feeling that demons were after him, and having nightmares and frequent crying spells. (Tr. 374-375).

On November 11, 2015, Plaintiff was again seen by Mr. Sarsany who noted no significant changes. (Tr. 377).

On November 13, 2015, Plaintiff presented to the emergency room for insomnia due to a mental disorder. (Tr. 346). Plaintiff reported that he was talking to a counselor and "got loud and

was talking a bunch of crazy, but didn't get aggressive." *Id*. Plaintiff said he was "pink slipped" to the ER for "aggressive behavior." *Id*. Plaintiff was cooperative in answering questions. *Id*. Plaintiff was discharged the following day. (Tr. 351). He was diagnosed with schizophrenia, refusal to take medications, and worsening psychosis. (Tr. 351, 354).

From November 14, 2015 until January 20, 2016, Plaintiff was hospitalized from mid-November 2015 through January 2016. (Tr. 368). His primary diagnosis was psychosis. *Id*. During his initial interview, Plaintiff was disorganized and engaged in "odd behavior like posturing." (Tr. 369). He again refused medications. *Id*. He was assessed a GAF score of 35 on admission, which improved to 55 upon discharge. (Tr. 368, 370). On discharge from the hospital, Plaintiff was more cooperative, his mood was "pretty good," his thought processes were more organized, his insight improved, his memory and concentration were grossly intact, and he did not appear internally stimulated. *Id*. His discharge diagnosis was schizoaffective disorder. (tr. 370).

On January 29, 2016, Plaintiff was seen by Mr. Sarsany, who noted Plaintiff was transitioning from an inpatient setting to a group home. (Tr. 382). He did not observe any acute psychosis. (Tr. 382).

On February 2, 2016, Plaintiff was seen by Dr. Chughtai, who noted Plaintiff was on Zyprexa since his discharge. (Tr. 397). Plaintiff again voiced his opposition to medications "and court told him that he can refuse the meds…" *Id*. Dr. Chughtai noted that Plaintiff's case manager was "going to work with him and she will make sure that group home will give him the meds." *Id*.

On March 1, 2016, Plaintiff presented for follow-up counseling with Mr. Sarsany. (Tr. 385-

386). Mr. Sarsany did not observe any maladaptive behavior patterns. (Tr. 386). Plaintiff was "anxious, distracted/poor concentration. preoccupied. Unsure if he is responding to internal stimuli." (Tr. 386). Plaintiff was taking his medications as prescribed. *Id.*

## 2. Medical and Non-Medical Opinions Concerning Plaintiff's Functional Limitations

On September 20, 2015, State agency physician Ermias Seleshi, M.D., reviewed Plaintiff's records on behalf of the state agency and opined that Plaintiff's mental impairment was not severe because, at that time, he had only suffered a single episode of psychosis with paranoid delusions and auditory hallucinations. (Tr. 68). Dr. Seleshi opined that Plaintiff's impairments did not significantly limit Plaintiff's ability to perform basic work activities. *Id.*

On November 13, 2015, State agency psychologist Jaime Lai, Psy.D., reviewed Plaintiff's records on reconsideration and affirmed Dr. Seleshi's opinion that Plaintiff's mental impairments were not severe and did not significantly limit Plaintiff's ability to perform basic work activities. (Tr. 76-77). She noted that the record did not contain any medical or other opinion evidence. (Tr. 77).

On November 16, 2015, social worker Jessica Rwejuna, LSW, wrote a letter indicating that Plaintiff was currently homeless, had previously resided with his mother but could not stay with her after a no contact order, and that he had stayed at "The Refuge of Hope" for a few nights but was asked not to return. (Tr. 362). She noted Plaintiff had no income, was recently approved for food stamps, and continues to believe that he does not have a problem or that he needs medication. *Id.* She stated that Plaintiff giggles and talks to himself, becomes agitated, is restless, and is unable to sit for more than a few minutes at a time. *Id.* She stated he required frequent redirection and consistent supervision. *Id.*

9

On April 4, 2016, Mr. Sarsany wrote a letter to Plaintiff's counsel, in which he opined that Plaintiff's "level of functioning is moderately to significantly impaired as evidenced by continued auditory hallucinations, poor attention and concentration, poor socialization, and impairment in following through with goal-directed activity." (Tr. 403).

**C. Relevant Hearing Testimony**

At the April 5, 2016 hearing, Plaintiff testified as follows:

- He graduated from high school in 2014. (Tr. 36). He received help with math. (Tr. 53). He does not have a driver's license. (Tr. 37, 46). He lives in an apartment by himself. (Tr. 37).

- He was prescribed Zyprexa and had been taking it for approximately two months. It causes him to feel "tired, sleepy." (Tr. 37).

- On a typical day, he watches television and just chills. (Tr. 37, 42-43). He sometimes attends bingo at his apartment complex. (Tr. 43).

- He cooks for himself. (Tr. 37). He sweeps the apartment every now and then. (Tr. 38).

- He is currently on probation and is tested for drugs every month. (Tr. 38). He stopped smoking marijuana approximately six months to a year earlier. *Id.*

- He sees a counselor every week or two. (Tr. 38). He sees his case manager weekly. (Tr. 38-39).

- He goes grocery shopping with his friend Danny, whom he sees every couple of weeks. (Tr. 39).

- He attends anger management classes every Monday. (Tr. 40).

- He consistently slept well. He sleeps from a little after midnight until the next afternoon. (Tr. 41-42).

- He usually gets along well with other people in his apartment building, but did get into an argument once. (Tr. 43).

- He was on medication because he was in the psychiatric ward and was yelling and agitated. (Tr. 43). The medication helps with his symptoms, but make him feel lethargic. (Tr. 45-46).

- He has not had any episodes since his discharge in January. (Tr. 43-44). He did not really have any symptoms. He had not heard any voices since being in the hospital. (Tr. 44).

- He thinks he is unable to work because "things get to [him]," and he is "energyless." (Tr. 45). His case manager, Jessica Rwejuna, had him file for disability. (Tr. 46).

- He had a few jobs after high school, but got fired. (Tr. 53).

Plaintiff' case manager, Ms. Rwejuna, testified that she had been assisting Plaintiff for seven months. (Tr. 47) She transports him to medical appointments and points him to different community resources. (Tr. 48). She believes Plaintiff's diagnosis is paranoid schizophrenia. *Id*. She said Plaintiff mumbles to himself often and has "little to no insight whatsoever." (Tr. 48). She did not think Plaintiff was ready to work, because he needs constant instruction. (Tr. 49). Plaintiff's two drug tests with the probation office have both been negative. *Id*. She counted Plaintiff's pills and believed he was missing approximately half of his doses. (Tr. 50). She considers herself an advocate and links her clients to various resources like Medicaid and food stamps. (Tr. 51). Plaintiff lives independently and can come and go as he pleases. (Tr. 52).

The ALJ posed the following hypothetical question to the VE:

> For these hypotheticals, please consider a younger individual with a high school education under the regulations. First hypothetical, Mr. Hodery, no exertional limitations, but the individual would be limited to simple, routine tasks, that do not involve arbitration, negotiation, confrontation. This person cannot direct the work of others or be responsible for the safety or welfare of others. This individual is limited to tasks that can be learned in 30 days or less. This person cannot perform piece rate work or assembly line work. This person is limited to occasional interaction with others.

(Tr. 55-56).

The VE testified that such an individual could perform a number of jobs and gave the following three examples: cleaner, industrial, Dictionary of Occupational Titles ("DICOT")

381.687-018, medium exertional, unskilled, SVP-2 (420,000 jobs nationally); linen-room attendant, DICOT 222.387-030, medium exertional, unskilled, SVP-2 (150,000 jobs nationally); and, cleaner, hospital, DICOT 323.687-010, medium exertional, unskilled, SVP-2 (350,000 jobs nationally). (Tr. 56).

The ALJ posed a second hypothetical that was the same as the first with the following additions: "the individual would require frequent redirection from a supervisor in order to stay on task. And that this level of redirection would continue for the length of the employment." (Tr. 57). The VE testified that such an individual would not be competitively employable. *Id.*

The ALJ posed a third hypothetical that was the same as the first with the added limitation that the individual would be off task 1/3 of the time. (Tr. 57). The VE again testified that such an individual would not be competitively employable. *Id.* A fourth hypothetical was again the same as the first but involved one absence or leaving early one day per week. (Tr. 58). Such an individual was unemployable. *Id.*

### III. Disability Standard

A claimant is entitled to receive benefits under the Social Security Act when he/she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when he cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a) and 416.909(a).

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir.

1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. 20 C.F.R. § 416.920(b). Second, the claimant must show that he suffers from a medically determinable "severe impairment" or combination of impairments in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits ... physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment (or combination of impairments) that is expected to last for at least twelve months, and the impairment(s) meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. § 416.920(d). Fourth, if the claimant's impairment(s) does not prevent him from doing past relevant work, the claimant is not disabled. 20 C.F.R. § 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment(s) does prevent him from doing past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. § 416.920(g).

### IV. Summary of the ALJ's Decision

The ALJ made the following findings of fact and conclusions of law:

1. The claimant has not engaged in substantial gainful activity since April 22, 2015, the application date (20 CFR 416.971 *et seq*.).

2. The claimant has the following severe impairments: schizophrenia and cannabis abuse (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, I find that the claimant has

the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: The claimant is limited to simple, routine tasks that do not involve arbitration, negotiation, confrontation, directing the work of others, or being responsible for the safety or welfare of others. The claimant can perform tasks that can be learned in 30 days or less. He cannot perform piece rate work or assembly line work. He is limited to only occasional interaction with others.

5.   The claimant has no past relevant work (20 CFR 416.965).

6.   The claimant was born on February 19, 1996 and was 19 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7.   The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since April 22, 2015, the date the application was filed (20 CFR 416.920(g)).

(Tr. 17-24).

## V. Law and Analysis

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010). Review must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may look

into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ. (*Id.*) However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Brainard*, 889 F.2d at 681. A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion. *Ealy*, 594 F.3d at 512.

**B.  Plaintiff's Assignments of Error**[3]

**1. Opinions of Plaintiff's Social Worker and Counselor**

Plaintiff challenges the weight ascribed by the ALJ to the opinions of Ms. Rwejuna, a social worker, and Mr. Sarsany, a counselor.

Mr. Sarsany is identified in the record as a "PCC," a professional clinical counselor. (Tr. 376). It is clear that Mr. Sarsany, as a professional clinical counselor, does not constitute an "acceptable medical source" under both the regulations and under case law. 20 C.F.R. § 416.902(a); *see, e.g., Gonzalez v. Comm'r of Soc. Sec.*, No. 5:14cv2322, 2015 WL 8483167 at **6-7 (N.D. Ohio Dec. 10, 2015) (Knepp, M.J.) ("a licensed professional clinical counselor … is

---

[3] Plaintiff's assignments of error are not clearly delineated. However, the court construes Plaintiff's Brief on the Merits as raising two arguments that have been largely intertwined but which will be addressed separately.

'not an acceptable medical source under the regulations'"); *Duff v. Comm'r of Soc. Sec.*, No. 5:14cv1293, 2015 WL 2250396 at *3 (N.D. Ohio May 13, 2015) (finding the ALJ properly classified a clinical counselor as a non-acceptable medical source) (Baughman, M.J.); *Hyland v. Comm'r of SSA*, No. 1:12cv02173, 2013 WL 4784706 at *9 (N.D. Ohio Sept. 5, 2013) (Burke, M.J.) (same); *Orleck v. Colvin*, No. 3:15-CV-279, 2016 WL 4035192, at *7 (S.D. Ohio July 28, 2016) ("a Licensed Professional Clinical Counselor, is not an acceptable medical source and instead falls under the category of 'other sources.'"), report and recommendation adopted, 2016 WL 4400311 (S.D. Ohio Aug. 17, 2016).

Though Mr. Sarsany clearly does not qualify as an "acceptable medical source" under the regulations, it is less clear whether a clinical counselor is properly considered a non-acceptable "medical source," 20 C.F.R. § 416.902(i) or a "nonmedical source." 20 C.F.R. § 416.902(j). The former includes individuals "licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law," while the latter includes educational personnel, including counselors, as well as public and private social welfare agency personnel. *Id.* The distinction, however, appears to be immaterial, as the updated regulations call for the same standards of consideration and articulation for "[o]pinions from medical sources who are not acceptable medical sources and from nonmedical sources." 20 C.F.R. § 416.927(f)(1) & (2). The regulations state that "[t]he adjudicator *generally should explain the weight given to opinions from these sources* or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 20 C.F.R. § 416.927(f)(2) (emphasis added).

The ALJ plainly complied with the directive of § 416.927(f)(2) and explained the weight

given to Mr. Sarsany's opinion as follows:

> Paul Sarsany, the claimant's counselor, submitted a letter regarding the claimant
> in April 2016. He opined that the claimant's level of functioning was moderately
> to significantly impaired as evidenced by continued auditory hallucinations, poor
> attention and concentration, poor socialization, and impairment in following
> through with goal-directed activity (Exhibit l0F/1).
>
> Mr. Sarsany is also not an "acceptable medical source" entitled to controlling
> weight. However, his opinion does require consideration. I afford it little weight.
> Upon review of the treatment records, it appears that Ms. [sic] Sarsany has only
> been treating the claimant since November 2015 (Exhibit 9F/3), right at the time
> the claimant began to have an uptick in symptoms, and required a 2-month long
> hospitalization. Mr. Sarsany's opinion does not appear to consider the claimant's
> extended of stability for much of 2015, likely because the claimant did not have
> any counseling services during his stable period. Further, the treatment notes and
> the claimant testimony indicate that the claimant has greatly improved since his
> inpatient stay at Northcoast.

(Tr. 23).

The ALJ's explanation was sufficient to satisfy the articulation required by the regulations

with respect to non-medical or other medical sources. Plaintiff's brief identifies no deficiency in

the ALJ's explanation. Instead, the Plaintiff suggests the ALJ misconstrued or misunderstood the

evidence and offers an alternate construction of the evidence of record. (R. 11, PageID# 474-

478). However, Plaintiff cites no law or regulation that suggests an ALJ must interpret the

evidence in a light most favorable to the finding of disability. By simply highlighting different

aspects of the record or offering an alternate interpretation of the evidence, a plaintiff does not

identify error requiring a remand.

Plaintiff also challenges the ALJ's decision to ascribe little weight to the opinion of Ms.

Rwejuna, a social worker who serves as Plaintiff's case manager. Under the regulations, social

workers not only fail to qualify as an "acceptable medical source," but are not even considered

"medical sources." 20 C.F.R. § 416.902(e). Nevertheless, as with opinions from medical sources who are not acceptable medical sources, the ALJ should "generally explain the weight given to opinions from these sources …." 20 C.F.R. § 416.927(f)(2). Again, this *explanation* requirement should not be confused with the "good reasons" requirement applicable to acceptable medical sources who have treated a claimant in their professional capacity. *See, e.g., Miller v. Comm'r of Soc.* Sec., 811 F.3d 825, 838 (6th Cir. 2016) (observing that a "licensed clinical social worker" is not an "acceptable medical source," and, therefore, rejecting the contention that a social worker's opinion was owed deferential weight); *accord Racz v. Comm'r of Soc. Sec.*, No. 3:15-cv-74, 2016 WL 612536 at *10 (S.D. Ohio Feb. 16, 2016) (finding it was erroneous to categorize a social worker as a "treating source," as "licensed independent social workers are not 'acceptable medical sources'"); *see also Payne v. Comm'r of Soc. Sec.*, 402 Fed. App'x 109 (6th Cir. 2010) (finding the "ALJ did not err in failing to include any limitations noted by ... the case manager.... [as] social workers are not acceptable medical sources."); *accord Hayes v. Comm'r of Soc. Sec.*, No. 1:09-cv1107, 2011 WL 2633945 at *6 (W.D. Mich. June 15, 2011) ("There is no 'treating social worker' rule. Social workers are not 'acceptable medical sources.' Their opinions are not treating-source opinions.") (internal citations omitted).

The ALJ complied with the explanation requirement and clearly articulated the weight he ascribed to Ms. Rwejuna's opinion as follows:

> The claimant's case manager, Jessica Rwejuna, appeared and testified at the hearing. She stated that the claimant is receiving counseling and anger management treatment. She stated that the claimant needs case management, as he is not able to get basic things done in the community. She opined that the claimant is not ready to work, as he has little insight and needs to be told to do things constantly. She also confirmed that the claimant is not consistently taking his medications.

Ms. Rwejuna is not an "acceptable medical source" entitled to controlling weight. However, her opinions do require consideration. I afford them little weight. She has been his case manager for seven months, during which the claimant had a vast uptick in symptoms. Her testimony does not acknowledge the claimant [sic] long period of stability, even without medications. Further, the claimant's own testimony and treatment notes indicate that he has improved since his most recent hospitalization.

Ms. Rwejuna also submitted a letter regarding the claimant in November 2015. She relayed that the claimant was currently homeless, and was asked to leave a homeless shelter. She indicated that the claimant did not believe he had a mental illness and would not take medication. She opined he needed frequent re-direction, little to no insight regarding his condition, and required constant supervision. Ms. Rwejuna reported that the claimant was currently psychiatrically hospitalized at NorthCoast (Exhibit 7F/3).

I also afford this opinion little weight. It was rendered at the time that the claimant was having an episode of decompensation, and his condition was much worse than it had been for most of the relevant period. Further, the claimant has again stabilized since November 2015, and is now able to live on his own in an apartment.

(Tr. 22-23).

The ALJ clearly complied with the articulation requirement applicable to non-medical sources, and included a rather extensive discussion of the opinion of Ms. Rwejuna. Plaintiff has not identified any grounds for remand by merely disagreeing with the ALJ's explanation or by suggesting that her opinion was consistent with Mr. Sarsany or with other evidence of record.

Therefore, Plaintiff's assignment of error, to the extent it challenges the weight ascribed to the opinions of Mr. Sarsany and Ms. Rwejuna, is without merit.

**2. RFC Not Supported by Substantial Evidence**

Plaintiff also suggests the RFC failed to adequately account for his limitations. However, Plaintiff fails to identify any functional limitations from any source aside from Mr. Sarsany and Ms. Rwejuna. As discussed above, the ALJ adequately explained his reasons for ascribing those

19

opinions little weight and, therefore, no error can be gleaned from the ALJ's failure to incorporate limitations that have been explicitly rejected. *See, e.g., White v. Comm'r of Soc. Sec., No. 3:13cv2106, 2014 WL 4983665 at *9 (N.D. Ohio Oct. 6, 2014)* (finding that where the ALJ properly rejected a medical source's opinions, the ALJ was under no obligation to include the rejected limitations in the RFC or the hypothetical). The court, however, will address Plaintiff's remaining arguments unrelated to the aforementioned opinions.

Because the Commissioner's decision must be upheld if substantial evidence supports it—regardless of whether substantial evidence also supports claimant's position, *see, e.g., Kirby v. Comm'r of Soc. Sec.*, 37 Fed. Appx. 182, 183 (6th Cir. 2002)—it is "immaterial if substantial evidence also supports a contrary position." *See Conley ex rel. N.C. v. Astrue,* No. 1:12cv1367, 2013 WL 1092457 at *3 (N.D. Ohio Mar. 15, 2013) (White, M.J.); *see also Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001) (a court must uphold the decision of the Commissioner even when substantial evidence exists to support both the Commissioner and the claimant); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997) (substantial evidence can exist to support and detract from the ALJ's decision); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (Secretary's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion). It necessarily follows that a claimant cannot establish that a decision lacks the support of substantial evidence merely by citing to portions of the record that supports her position or is potentially inconsistent with ALJ's finding. Therefore, to the extent Plaintiff believes that a remand is required, he must do more than simply cite those portions of the record that he believes could support a finding of disability.[4]

---

4 While there is significant evidence that Plaintiff suffers from a mental impairment, to the extent Plaintiff

Plaintiff's brief cites law standing for the proposition that an ALJ may not substitute his own medical judgment for that of the treating physician or psychologist. (R. 11, PageID# 474). Plaintiff's argument, however, does not identify a single opinion from a treating acceptable medical source concerning Plaintiff's functional limitations that is inconsistent with the RFC. As discussed above, neither Ms. Rwejuna nor Mr. Sarsany were "acceptable medical sources." Furthermore, contrary to plaintiff's argument, "at the administrative law judge hearing level … the administrative law judge … is responsible for assessing your residual functional capacity." 20 C.F.R. § 416.946(c). "Although the ALJ may not substitute his opinion for that of a physician … an ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding." *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir. 2009) (*citing Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 197 (6th Cir. 2004)); *accord Courter v. Comm'r of Soc. Sec.*, 479 Fed. Appx. 713, 722 (6th Cir. 2012); *Oliver v. Comm'r of Soc. Sec.*, No. 3:14cv1793, 2015 WL 4661902 at *8 (N.D. Ohio Aug. 5, 2015) (Helmick, J.).

The ALJ did not improperly substitute his own judgment for that of an acceptable medical source. In fact, the only opinions of record from an "acceptable medical source" concerning Plaintiff's functional limitations came from the State agency physicians who opined Plaintiff's mental impairments were not severe. The ALJ, however, rejected those opinions as they did not reflect impairments or limitations available in the updated record.[5] (Tr. 23). The ALJ's finding,

---

is arguing that the ALJ should have found Plaintiff more credible or asks this court to reweigh the evidence of record, the court declines to do so. A social security appeal does not allow a court to review the evidence *de novo*, to make credibility determinations, or to reweigh the evidence. *Brainard*, 889 F.2d at 681.

[5] Plaintiff does not challenge the ALJ's rejection of an acceptable medical source's opinion where such

that Plaintiff was stable for much of the alleged period of disability despite a lack of treatment (Tr. 23), is firmly supported by the record.

Finally, Plaintiff suggests that because he was hospitalized for 94 days in a period of sixteen months, he would be hospitalized for an average of five days per month. (R. 11, PageID# 478-479). With respect to this line of argument, Plaintiff's brief has not challenged the ALJ's determination that he did not meet or medically equal a listing. (R. 11). In fact, at the hearing, Plaintiff's counsel conceded that "[t]here is not evidence of repeated episodes of [decompensation] — each of extended duration." (Tr. 35). Moreover, Plaintiff's argument is irrelevant, as the basic definition of disability requires "physical or mental impairment which … has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To the extent Plaintiff suggests that there is a pattern of increased duration of inpatient hospitalization or that Plaintiff's course of treatment will be ineffective in preventing future episodes of inpatient treatment, such an argument is pure conjecture and is not based on a single medical opinion in the record. Plaintiff would have this court assume—without any basis in the record—that the ensuing sixteen month period *after* the hearing would mirror the same frequency of inpatient hospitalization as the sixteen month period currently in the record. Based on this speculative assumption, Plaintiff contends he would be absent from work with such a frequency as to be unemployable. (R. 11, # 478-479). The court declines to draw such an assumption.

Plaintiff's assignment of error is without merit.

---

opinion was unfavorable to Plaintiff.

## IV.   Conclusion

For the foregoing reasons, it is recommended that the Commissioner's final decision be

AFFIRMED.

s/ *David A. Ruiz*

David A. Ruiz
United States Magistrate Judge

Date: June 22, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the district court's order.   *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985),** *reh'g denied,* **474 U.S. 1111 (1986).**